Aubrey COUCH

v.

J. David BOWMAN.

Civ. A. No. 5642.

United States District Court
E. D. Tennessee, N. D.

Dec. 1, 1966.

Teddy L. Willocks, Creekmore, Thomson & Evans, Knoxville, Tenn., for libellant.

J. H. Doughty, Hodges, Doughty & Carson, Knoxville, Tenn., for respondent.

ROBERT L. TAYLOR, Chief Judge.

This is an action in admiralty for personal injuries allegedly sustained by the libellant, Mr. Couch, on or about September 18, 1965 while he was standing on or near his boat dock situated on the bank of Ft. Loudoun Lake.

It is the theory of Mr. Couch that while standing on his pier a boat came downstream on the lake piloted by Mr. Bowman, and that the boat made unusual or extraordinary waves or swells thus causing the libellant's boat attached to his dock to become disengaged from the dock and to cause him to be thrown from the bank or walkway or from the boat into the lake causing severe and painful injury to him including the fracture of four ribs.

Mr. Couch claims that the respondent, Mr. Bowman, also violated Title 46 U.S.C. Section 526*l* which provides in substance

that no person shall operate any motor boat or other vessel in a reckless, negligent manner so as to endanger the life or property of any person; that the defendant likewise violated Section 70–2206 of the Tennessee Code Annotated which prohibits certain named wrongful actions of operators of vessels on the waters within the territorial area of the State of Tennessee.

Mr. Couch says that respondent was operating his boat too fast under the circumstances existing at the time of the accident and resulting injuries.

The respondent denies liability, denies that he was at fault or that he was guilty of any alleged negligence. He denies that Mr. Couch was injured to the extent claimed by him. He denies violation of any federal or state statute in the operation of his boat. He denies that Mr. Couch sustained any injury or loss as the direct and proximate result of any negligence upon his part. He denies that the attorneys for Mr. Couch are entitled to any award for counsel fees.

The issues as set forth in the pre-trial order are: (1) Did respondent violate any obligation in admiralty or under the common law or state or federal law which was the proximate cause of the accident and resulting injuries; (2) Was Mr. Couch guilty of negligence; if so, of how much negligence as compared with the negligence of the respondent, if any; (3) if the libellant, Mr. Couch, is entitled to a recovery, what is the amount.

The Court has heard of evidence of various witnesses today relating to the circumstances leading up to and at the time of the accident. The evidence shows in substance that Mr. Couch has a residence located on the bank of Ft. Loudoun Lake which would be the left bank going downstream as shown on the aerial photograph, Exhibit No. 1 filed in this record; that in front of this residence and on the lakeside is a boat dock which, according to the proof, was well constructed and well buttressed for esthetic values as well as its protection to the bank from erosion caused by passing boats; that

the dock was constructed on the bank of this lake some four years before the accident which is the subject of this lawsuit occurred; that many boats passed harmlessly by the dock from day to day; that on the occasion of the accident libellant's boat was firmly attached to the dock by a line with a test strength of 1,500 pounds; that as Mr. Couch came down the walkway going to his boat the respondent came downstream returning from the vicinity of the football stadium in Knoxville where he had gone for the purpose of photographing boats attached to docks immediately behind Neyland Stadium.

Mr. Couch testified that he saw the respondent's boat shortly before the accident; that shortly before the accident he saw or felt the wave from the respondent's boat but did not have time to protect himself; that he did not anticipate the extraordinary waves or swells caused by it as none had occurred theretofore comparable to those which caused the accident.

Mr. Couch testified in substance that his boat was knocked loose from the dock, that the waves either struck him or caused the boat to strike him and as a result he was thrown into the lake and suffered the personal injuries described in detail in his testimony.

Mrs. Couch corroborates the testimony of her husband in every material respect.

Respondent says that Mr. Couch was negligent on the occasion of the accident and his attorney made a fervent argument to support Mr. Bowman's testimony in that respect. The Court is unable to agree.

Mr. Couch was on his own boat dock in front of his own house. He had his boat properly attached to the dock, and in the opinion of the Court he was not negligent on the occasion of this accident. As testified, when those waves came the force of them was unexpected. The Court gathered from the manner of Mrs. Couch on the stand as much as by her words that those waves were extraordinary and "were not ex-

pected by me or my husband and we did not have time to do hardly anything."

■ This brings us to the question, whether Mr. Bowman is liable for this accident. His attorney says that strict liability does not exist in a boat accident on a navigable stream. His attorney is correct in that respect.

■ Before there can be liability in a case of this kind there must be fault. But that does not mean there must be a violation of a federal or state statute in order that there be fault.

The controlling question in this lawsuit is whether Mr. Bowman was guilty of any negligence in the operation of his boat which proximately caused the accident and resulting injuries. This requires a close examination of the evidence.

The evidence shows that Mr. Bowman was an experienced boat operator. It further shows that he is not a reckless, dare-devil kind of an operator. On the occasion of this accident there were with him his wife and daughter and several young girls who were friends of his daughter. He had every incentive to operate that boat with reasonable care.

The proof shows that at and prior to the time of the accident he was within the channel fixed by the Coast Guard in the lake. The preponderance of the evidence shows that he was operating his boat around 15 to 18 to 20 miles an hour, although perhaps one witness was of the opinion that it was moving in excess of 20 miles per hour. However, the Coast Guard Chief Petty Officer was of the opinion that that particular boat would not under ordinary circumstances go in excess of 20 miles an hour and the Court is of the opinion that the overall evidence shows that the boat was running at a rate of speed of between 15 and 20 miles an hour, perhaps more nearly around 18 miles an hour at the time of this accident.

The proof further shows that Mr. Bowman had gone up the lake, or in the direction of Knoxville, around 2:00 p. m.; that he came downstream around 5:00 p. m.; that when he went upstream he observed Mr. Couch at his boat dock and waved at him. Immediately before and at the time of the accident Mr. Bowman was signaling with a loudspeaker to Mr. Cappiello whose residence is on the right side of the lake going downstream.

Mr. Bowman testified that he did not see Mr. Couch as he travelled downstream because of an island which is in front of Mr. Couch's boat dock and out in the lake some 260 feet.

Libellant's attorneys contend that the accident could have been avoided if Mr. Bowman had followed a course farther away from the Couch boat dock or to the right in the direction he was traveling and that he was negligent in failing to do so. Libellant's attorneys also argued that he was going too fast under the circumstances existing at the time and immediately prior to the accident.

The proof shows that Mr. Bowman's boat is with two exceptions the largest boat that operates on the lake. The Chief Petty Officer stated that the greater the amount of water that is displaced by a boat, the greater the swell or the greater the waves it will make.

The Coast Guard Chief Petty Officer had received many complaints about the large waves or swells created by the Bowman boat on the lake. At the very time of this accident Mr. Bowman was signaling to Mr. Cappiello who had previously complained that waves made by the Bowman boat had caused erosion of the bank near where he lived. There is proof that some of these complaints were made unjustly because they were made, according to some of the proof, while the boat was not on the lake. But the Court is sure in its own mind that the boat operated by Mr. Bowman on the occasion of this accident created an unusual swell in the lake and was the cause of the accident and resulting injuries.

The Court is further of the opinion that those extraordinary swells could have been avoided by proper care. The Court is of the opinion that Mr. Bowman was thinking of Mr. Cappiello at the time

of the accident and had he gone to the right or slowed down before getting in near proximity of libellant's dock this accident could have been avoided.

In O'Donnell Transportation Co. v. M/V Maryland Trader, 228 F.Supp. 903, 909 (D.C.N.Y.) the Court said:

"A ship passing piers or docks where other vessels are tied up is obligated to proceed carefully and prudently so as to avoid creating unusual swells or suction which would damage craft properly moored or installations along the shoreline. West India Fruit & S. S. Co. v. Raymond, 190 F.2d 673 (5 Cir. 1951); The Hendrick Hudson, 163 F. 862 (S.D.N.Y.), aff'd 168 F. 1021 (2 Cir. 1909); James Shewan & Sons v. New England Navigation Co., 155 F. 860 (E.D.N.Y.1907) rev'd on other grounds 169 F. 285 (2 Cir. 1909). See also The Priscilla, 15 F.2d 455 (S.D.N.Y.1926). The moving vessel must take into consideration the reasonable effects to be anticipated from its speed and motion through the water and must take such precautions by way of reduction of speed or alteration of course as may be reasonably necessary to prevent such damage. Moran v. The M/V Georgie May, 164 F.Supp. 881 (S.D.Fla.1958); Ferryboat Columbia, 1937 A.M.C. 881 (E.D.N.Y.); The Southern Cross, 21 F.2d 75 (E.D.N.Y.), aff'd 21 F.2d 76 (2 Cir. 1927); The Rotherfield, 123 F. 460 (S.D.Ala. 1903). See also The Chester W. Chapin, 155 F. 854 (E.D.N.Y.1907); The Majestic, 48 F. 730 (2 Cir. 1891).

\*     \*     \*     \*     \*     \*

"Once libelant has established that swells or suction caused damage to its craft tied up at the shoreline, that such craft were properly moored to resist ordinary swell and suction normally to be anticipated, and that the swells came from the passing vessel charged with liability, the vessel which caused the swell is then required to exonerate itself from blame. In order to avoid liability she must show that it was not in her power to prevent the injury by any practical precautions she could have adopted. West India Fruit & S. S. Co. v. Raymond, supra; Ferryboat Columbia, supra; The Rotherfield, supra."

See also, The Hendrick Hudson, 163 F. 862 (D.C.N.Y.)

■ The Court is constrained to find that Mr. Bowman was negligent in the manner in which he piloted his boat past the dock and that this negligence was the proximate cause of the accident. In so holding it must be understood that the Court does not reflect in any respect upon the character of Mr. Bowman or upon him as an operator of this boat. There is much proof in the record to show that it is Mr. Bowman's wish always to operate his boat in compliance with the safety regulations of the Coast Guard.

■ This brings us finally to the question of the amount of damages. In a personal injury case the amount of damages is almost always an imponderable factor for the determination of the Court.

■ The proof shows that Mr. Couch was a man of 52 years of age, in good health at the time of this accident; that he had a highly responsible executive job in one of the large banks of the City of Knoxville. As previously indicated he sustained four broken ribs which necessarily caused him considerable pain. He was in the hospital a week and away from work two weeks. His income was at the rate of $240.00 per week and his earning capacity was curtailed for two weeks because of his disabilities growing out of this accident. He incurred doctor bills of $440.55, or a total of $920.00.

The question is how much are his ribs worth. How much is the loss of a pint of blood in the lung region worth? How much are the bruises and lacerations worth? How much is the discoloration of the skin on his back worth? In the opinion of the Court the discoloration is inconsequential, but these broken ribs are not inconsequential.

The Court fixes the damages at $4,920.55.